08-4113-cv
Bolmer v. Oliveira

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

--------

August Term, 2009

(Argued: November 13, 2009        Decided: February 8, 2010)

Docket No. 08-4113-cv

------------------------------------------------------------X

BRETT BOLMER,

Plaintiff-Appellee,

- v. -

JOSEPH OLIVEIRA, M.D., CONNECTICUT DEPARTMENT OF MENTAL HEALTH
AND ADDICTION SERVICES,

Defendants-Appellants,

MALENA SANGUT, DIANE DEKEYSER, M.D., VICTORIA ESTABA, M.D., DONNA
PELLERIN, M.D., DANBURY HOSPITAL,

Defendants.[*]
------------------------------------------------------------X

Before:   McLAUGHLIN and WESLEY, Circuit Judges, and KAHN,
          District Judge.[**]

Appeal from an order of the United States District Court for

the District of Connecticut (Arterton, J.) entered August 6,

2008.  The court denied summary judgment to Defendants who had

---

[*]  The Clerk of the Court is directed to amend the official
caption as set forth above.

[**]  The Honorable Lawrence E. Kahn, United States District Judge
for the Northern District of New York, sitting by designation.

asserted qualified immunity and Eleventh Amendment immunity defenses. On interlocutory appeal, Defendants-Appellants raise several arguments we have no jurisdiction to review, and we DISMISS the appeal as to these arguments. As to their reviewable challenges, we cannot conclude as a matter of law that Defendants-Appellants are entitled to qualified immunity or Eleventh Amendment immunity. We therefore AFFIRM the denial of summary judgment on these defenses.

EMILY V. MELENDEZ, Assistant Attorney General, for Richard Blumenthal, Attorney General of the State of Connecticut, Office of the Attorney General, Hartford, CT, for Defendants-Appellants.

WILLIAM BROOKS, Touro Law Center, Central Islip, NY, for Plaintiff-Appellee.

NANCY B. ALISBERG, Office of Protection & Advocacy for Persons with Disabilities, Hartford, CT, for Plaintiff-Appellee.

SUSAN J. KOHLMANN, Jenner & Block LLP (Danielle F. Tarantolo, on the brief), New York, NY, for Amici Curiae National Disability Rights Network, New York Lawyers for the Public Interest, and Vermont Protection & Advocacy, Inc., in support of Plaintiff-Appellee.

McLAUGHLIN, Circuit Judge:

This case arises from the involuntary commitment of Brett Bolmer. He sued various individuals and entities involved in his commitment in the United States District Court for the District of Connecticut (Arterton, J.). As relevant to this appeal, Bolmer claimed that Dr. Joseph Oliveira violated his Fourth Amendment and substantive due process rights enforceable under 42 U.S.C. § 1983, and falsely imprisoned him in violation of Connecticut law, when he ordered Bolmer committed. Bolmer also alleged that the Connecticut Department of Mental Health and Addiction Services ("DMHAS") violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 et seq., by "stereotyping Mr. Bolmer as an unreliable individual who manifested delusions because of his diagnosed mental illness."

Oliveira and DMHAS moved for summary judgment on the grounds that (1) Oliveira, as a state officer, has qualified immunity to Bolmer's § 1983 claims and has sovereign immunity to the false imprisonment claim; and (2) DMHAS is immune to the Title II claim under the Eleventh Amendment. The district court granted summary judgment on Oliveira's defense of sovereign immunity to Bolmer's false imprisonment claim, but denied summary judgment on the qualified immunity and Eleventh Amendment immunity defenses.

3

On interlocutory appeal, Defendants-Appellants raise several arguments we have no jurisdiction to review under the collateral order doctrine, and we dismiss the appeal as to these arguments. However, their central thrust raises reviewable challenges to the legal standards the district court employed in denying them summary judgment on their qualified immunity and Eleventh Amendment immunity defenses.

First, Oliveira argues that the medical-standards test set forth in Rodriguez v. City of New York, 72 F.3d 1051 (2d Cir. 1995) for determining whether an involuntary commitment violates substantive due process is inconsistent with County of Sacramento v. Lewis, 523 U.S. 833 (1998). He contends that it imposes liability for conduct that does not "shock the conscience." We disagree, and hold that Rodriguez is consistent with Lewis.

Second, DMHAS believes that, under Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98 (2d Cir. 2001), the district court should have required a showing that it acted with discriminatory animus or ill will before denying it summary judgment on its Eleventh Amendment immunity defense to Bolmer's Title II claim. Absent such a showing, DMHAS argues, Congress's abrogation of DMHAS's immunity is invalid. Because Garcia was based on Congress's enforcement of the Equal Protection Clause, we hold that it is not applicable when Congress's abrogation is

4

supported by its enforcement of the substantive due process right not to be involuntarily committed absent a danger to self or others.

Because we cannot conclude as a matter of law that Defendants-Appellants are entitled to qualified immunity or Eleventh Amendment immunity, we affirm the denial of summary judgment on these defenses.

**BACKGROUND**

Plaintiff-Appellee Brett Bolmer has a history of mental illness. In 2003, the Greater Danbury Mental Health Authority ("GDMHA") began providing housing to Bolmer through its Transitional Housing Program (the "Program"). GDMHA is a local agency of DMHAS that provides out-patient services to patients in its care. As part of the Program, Bolmer was assigned a case manager, Lisa Kaminski. Bolmer and Kaminski had known one another before, having grown up in the same town. Upon Kaminski's appointment, the two began communicating frequently through text messages and phone calls.

According to Bolmer, he began a sexual relationship with Kaminski in February 2004. He claims that they would meet once or twice per week at Kaminski's apartment.

On September 13, 2004, Bolmer placed roses on Kaminski's car. He asserts that when he saw Kaminiski later that day, she told him that their relationship was over.

The next day, Bolmer told the director of the Program, Rick Hammond, that he had been involved in a sexual relationship with Kaminski. He also told a GDMHA caseworker, Mike Anello. Around the same time, Kaminski notified Hammond that Bolmer had left flowers on her car and had called her twice. GDMHA staff questioned whether Bolmer was manifesting "erotomania," a psychiatric syndrome characterized by a false belief that there exists a romantic relationship with another person. No one believed in the alleged sexual relationship with Kaminski. A GDMHA caseworker, Joe Halpin, informed Bolmer's probation officer of the situation. The officer called Bolmer and told him to return to the GDMHA facility. Bolmer complied.

The facts surrounding Bolmer's return to GDMHA are controversial. According to Bolmer, he was annoyed when he had to return, so he was speaking loudly to the staff, but was not yelling. Dr. Joseph Oliveira, a GDMHA psychiatrist whom Bolmer had never met, entered the room and, without introducing himself, told Bolmer that he was there to conduct a "mini mental health exam." Oliveira asked Bolmer to repeat three words: "motor, tree, giraffe," but "barely" asked him any questions. At this

point Bolmer realized that Oliveira was considering whether to have him committed. Bolmer tried to explain his feelings about his breakup with Kaminski to those in the room – Oliveira, Halpin, and Anello – but they "kept looking at [him] as if [he] was crazy to be thinking that a case worker could possibly have an affair with a crazy person." Oliveira "rolled his eyes" at Bolmer.

Frustrated that no one believed him, Bolmer began talking about other injustices he had suffered. After someone told him to calm down, Bolmer attempted to convey that he was not angry. He stated that "if [he] was really angry that [he] would pick up the chair in the room and throw it." Oliveira then opened the door and police and ambulance workers "came rushing in." Bolmer claims that the examination lasted "no more than five minutes."

According to DMHAS and Oliveira, when Bolmer returned to the GDMHA facility he was yelling loudly enough for Oliveira to hear him in the next room. Out of concern for everyone's safety, Oliveira had a staff member call the police. During the evaluation, Bolmer exhibited increasing anger and hostility, stating that if he were angry, he "would pick up the fan in the room and throw it and go over and kick Joe Halpin in the head." At this point, Oliveira determined that the examination could not

7

continue safely. According to Oliveira and GDMHA staff, the examination lasted at least 15 minutes.

The parties do not dispute that, at the conclusion of the examination, Oliveira executed a Physician's Emergency Certificate ordering Bolmer involuntarily committed "for no more than 15 days care and treatment in a mental hospital." Oliveira noted on the Certificate that Bolmer was having erotomanic delusions about Kaminski, and appeared angry and hostile. He concluded, "Patient at this time, in my clinical opinion, is dangerous and poses a threat to others."

The ambulance workers transported Bolmer to Danbury Hospital, a private institution providing in-patient psychiatric care to GDMHA clients under a contract with the state. At the hospital, staff strapped Bolmer to his bed and injected him with Geodon, an anti-psychotic medication. After a staff member discovered that Bolmer's cell phone contained numerous text messages between him and Kaminski, the hospital discharged Bolmer two days later.

Phone records later revealed that Bolmer and Kaminski had a history of communicating frequently, and that the communications were initiated by both parties. Kaminski conceded that she used poor judgment in her extensive communications with Bolmer, but denied any sexual relationship.

In October 2004, DMHAS fired Kaminski for violating DMHAS Work Rule Number 18: "The development of sexual or otherwise exploitive relationships between employees and clients is prohibited."

In February 2006, Bolmer sued Oliveira, DMHAS, and certain others involved in his involuntary commitment. Bolmer claimed (1) under 42 U.S.C. § 1983, that Oliveira violated the Fourth and Fourteenth Amendments by ordering him committed; (2) that Oliveira falsely imprisoned him in violation of Connecticut law; and (3) that DMHAS violated Title II of the ADA by "stereotyping Mr. Bolmer as an unreliable individual who manifested delusions because of his diagnosed mental illness."

In January 2008, Oliveira and DMHAS (together, the "State Defendants") moved for summary judgment. The State Defendants and Bolmer both submitted expert affidavits on the issue of whether Oliveira's examination was consistent with generally accepted medical standards. Not surprisingly, the State Defendants' expert believed that the examination was consistent, and Bolmer's expert did not.

In his response to the State Defendants' motion, Bolmer indicated that he did not intend to pursue his § 1983 Fourth Amendment claim against Oliveira.

In August 2008, the district court granted summary judgment to Oliveira on Bolmer's false imprisonment claim, but denied it on the § 1983 and Title II claims. <u>First</u>, the court found that Oliveira, as a state officer, was shielded from Bolmer's false imprisonment claim by sovereign immunity. The court stated:

> Although Mr. Bolmer's allegations, if true, could support a finding of negligence on the part of Dr. Oliveira, he points to no acts or statements which demonstrate malice or wantonness. . . . The evidence which Mr. Bolmer has marshaled in support of his claims may point to indifference, but there is no evidence of extreme conduct which could satisfy the intentionality required by the Connecticut Supreme Court to eliminate Dr. Oliveira's immunity against suit on the state law claims in this Court.

<u>Bolmer v. Oliveira</u>, 570 F. Supp. 2d 301, 317 (D. Conn. 2008).

<u>Second</u>, the district court denied summary judgment on Oliveira's qualified immunity defense to the § 1983 Fourteenth Amendment claim. Bolmer's claim was that Oliveira violated his right to substantive due process by ordering him committed based on a deficient examination. The district court applied <u>Rodriquez v. City of New York</u>, 72 F.3d 1051 (2d Cir. 1995), which held that an involuntary commitment violates substantive due process if the decision to commit is based on "substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community." <u>Id.</u> at 1063. Here, the parties' experts based their opinions on differing

10

versions of the facts, and disagreed on the applicable medical standards. Thus, the question whether Oliveira's decision fell substantially below those standards remained for trial.

Third, the district court found that material issues of fact also precluded summary judgment on DMHAS's defense of Eleventh Amendment immunity to the Title II claim. As the court saw it, the issue turned on whether Congress's abrogation of DMHAS's immunity to Bolmer's Title II claim was appropriate. Under United States v. Georgia, 546 U.S. 151 (2006), the abrogation was valid if DMHAS violated both Title II and the Fourteenth Amendment. Because there were material issues of fact as to whether such violations occurred, the validity of Congress's abrogation could not be resolved on summary judgment.

Last, the district court denied summary judgment to Oliveira on Bolmer's Fourth Amendment claim without discussing the claim.

The State Defendants appeal the denial of summary judgment, resting on the collateral order doctrine as the basis for our jurisdiction. Specifically, Oliveira contends that he has qualified immunity to the § 1983 substantive due process claim for four reasons: (1) Bolmer's expert offered insufficient evidence of the applicable medical standards to create a genuine issue of fact as to what those standards are; (2) Oliveira's conduct did not rise to the level of a substantive due process

11

violation because it did not "shock the conscience" under County of Sacramento v. Lewis, 523 U.S. 833 (1998); (3) Danbury Hospital staff, and not Oliveira, were responsible for Bolmer's commitment; and (4) an involuntary commitment will not violate substantive due process when a more specific constitutional provision - here, the Fourth Amendment – applies.

Oliveira also argues that the district court should have granted him summary judgment on Bolmer's § 1983 Fourth Amendment claim because the claim was abandoned.

DMHAS contends that the Eleventh Amendment bars litigation of Bolmer's Title II claim because he failed to show that DMHAS acted with discriminatory animus or ill will under Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98 (2d Cir. 2001), and therefore Congress's abrogation of DMHAS's Eleventh Amendment immunity is invalid.

**DISCUSSION**

**I.  Appellate Jurisdiction and Standard of Review**

Though neither party contests our appellate jurisdiction, we are obligated to consider the issue sua sponte. Joseph v. Leavitt, 465 F.3d 87, 89 (2d Cir. 2006).

Orders denying summary judgment are generally not immediately appealable "final decisions" under 28 U.S.C. § 1291. See Finigan v. Marshall, 574 F.3d 57, 60 n.2 (2d Cir. 2009).

12

Pursuant to the collateral order doctrine, however, we have jurisdiction over interlocutory appeals of orders denying claims of qualified immunity and Eleventh Amendment immunity. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985) (qualified immunity); Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 141 (1993) (Eleventh Amendment immunity). The principal justification for allowing such appeals is that "'[t]he entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Puerto Rico Aqueduct & Sewer Auth., 506 U.S. at 144 (quoting Mitchell, 472 U.S. at 526).

However, to avoid running afoul of the collateral order doctrine's requirement that a reviewable order "involve a 'clai[m] of right separable from, and collateral to, rights asserted in the action,'" we may review immunity denials only to the narrow extent they turn on questions of law. Mitchell, 472 U.S. at 527-30 (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)); see Komlosi v. N.Y. State Office of Mental Retardation and Developmental Disabilities, 64 F.3d 810, 814-15 (2d Cir. 1995). In short, where the district court denied immunity on summary judgment because genuine issues of material fact remained, we have jurisdiction to determine whether the

13

issue is <u>material</u>, but not whether it is <u>genuine</u>. <u>Jones v. Parmley</u>, 465 F.3d 46, 55 (2d Cir. 2006). Stated differently, we may determine whether a defendant is entitled to immunity "on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." <u>Salim v. Proulx</u>, 93 F.3d 86, 90 (2d Cir. 1996). But we may not review the district court's ruling that "the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense." <u>Id.</u> at 91. Cabined by these constraints, our review is <u>de novo</u>. <u>Jones</u>, 465 F.3d at 55.

Where we have jurisdiction over an interlocutory appeal of one ruling, we have the discretion to exercise pendent appellate jurisdiction over other district court rulings that are "'inextricably intertwined'" or "'necessary to ensure meaningful review'" of the first. <u>Ross v. Am. Express Co.</u>, 547 F.3d 137, 142 (2d Cir. 2008) (quoting <u>Swint v. Chambers County Comm'n</u>, 514 U.S. 35, 51 (1995)). We recognize, however, that "pendent appellate jurisdiction should be exercised sparingly, if ever." <u>Mancuso v. N.Y. State Thruway Auth.</u>, 86 F.3d 289, 292 (2d Cir. 1996).

Here, Defendants-Appellants assert the collateral order doctrine as the sole basis for appellate jurisdiction. They are

14

correct that the doctrine provides for jurisdiction to the extent their appeal turns on questions of law related to their immunity defenses. However, they ask us to delve deeper.

First, Defendants-Appellants offer their version of the contested facts surrounding Bolmer's commitment. We lack jurisdiction to compare their factual evidence with Bolmer's. See Salim, 93 F.3d at 90-91. Indeed, Defendants-Appellants' contention that Bolmer failed to provide evidence sufficient to create an issue of fact as to the applicable medical standards falls squarely within the category of evidence-sufficiency arguments we may not review. See id. at 91; see also Grune v. Rodriguez, 176 F.3d 27, 32 (2d Cir. 1999). We therefore dismiss the appeal as to this argument, and confine our review to "the facts favorable to [Bolmer] that the trial judge concluded the jury might find," including those it did not explicitly identify but "'likely assumed.'" Salim, 93 F.3d at 90 (quoting Johnson v. Jones, 515 U.S. 304, 319 (1995)).

Second, Defendants-Appellants seek to reverse the denial of summary judgment on Bolmer's § 1983 Fourth Amendment claim. They assert that the claim was abandoned. Defendants-Appellants do not explain how the district court's apparent denial of summary judgment on this claim constitutes an appealable collateral order, nor how the issue is "'inextricably intertwined'" or

15

"'necessary to ensure meaningful review'" of the immunity denials such that we should exercise pendent jurisdiction. Ross, 547 F.3d at 142 (quoting Swint, 514 U.S. at 51). It was their duty to do so. See Fed. R. App. P. 28(a)(4). Having failed to explain a basis for appellate jurisdiction, and none being apparent, we also dismiss the appeal to the extent it challenges the denial of summary judgment on the Fourth Amendment claim.

## II. Qualified Immunity

Government actors have qualified immunity to § 1983 claims "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 432 (2d Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a state actor, Oliveira is immune to Bolmer's § 1983 substantive due process claim if (1) the reviewable facts do not make out a violation of Bolmer's right to substantive due process, or (2) the right was not clearly established at the time of Bolmer's commitment. See Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009). Oliveira does not argue that Bolmer's substantive due process right was not clearly established.[1] He is therefore entitled to qualified

---

[1] Oliveira does state in his reply brief that by discussing perceived ambiguities in Rodriguez, Bolmer "has actually opened .

16

immunity only if, on the facts favorable to Bolmer that the district court concluded a jury might find, he did not violate Bolmer's right to substantive due process.

The Due Process Clause of the Fourteenth Amendment has a substantive component that bars certain state actions "'regardless of the fairness of the procedures used to implement them.'" County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). Substantive due process prohibits states from involuntarily committing nondangerous mentally ill individuals. See O'Connor v. Donaldson, 422 U.S. 563, 575-76 (1975). It does not, however, "require a guarantee that a physician's assessment of [dangerousness] be correct." Rodriguez v. City of New York, 72 F.3d 1051, 1062 (2d Cir. 1995). Rather, we held in Rodriguez that an involuntary commitment violates substantive due process if the decision is made "on the basis of substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community." Id. at

. . . the door for Dr. Oliveria [sic] to make the argument that the law was not clearly established." (Reply Br. of Defendants-Appellants at 13.) But even if this excuses Oliveira's raising the argument for the first time in his reply brief, the argument itself is insufficiently explained to merit review. See Norton v. Sam's Club, 145 F.3d 114, 117-18 (2d Cir. 1998).

17

1063.  What those standards are is a question of fact.  Id.; see also Olivier v. Robert L. Yeager Mental Health Ctr., 398 F.3d 183, 191-92 (2d Cir. 2005).

Some three years after our decision in Rodriguez, the Supreme Court held in County of Sacramento v. Lewis that for executive action to violate substantive due process, it must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  523 U.S. at 847 n.8.  The Court indicated, however, that the shocks-the-conscience inquiry is not a stand-alone test for determining whether particular executive conduct violates substantive due process; rather, it provides a framework for making such a determination.  See id. at 847 ("While the measure of what is conscience shocking is no calibrated yardstick, it does, as Judge Friendly put it, 'poin[t] the way.'" (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973))).  Several principles support this framework.

First, "the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability."  Id. at 848.  Thus, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," but "injuries . . . produced with culpability falling

18

within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." Id. at 849 (internal quotation marks and citation omitted).

Second, whether particular executive action shocks the conscience is highly context-specific.

> "The phrase [due process of law] formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial."

Id. at 850 (quoting Betts v. Brady, 316 U.S. 455, 462 (1942)). Thus, "concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Id.

In Lewis, a Sacramento County sheriff's deputy attempted to stop two teenage boys who were speeding on a motorcycle. Id. at 836. When the teenagers refused to pull over, a high-speed chase ensued. The chase ended when the motorcycle tipped over during a sharp turn. The pursuing deputy was unable to avoid skidding into the motorcycle passenger, Phillip Lewis, at 40 miles per

19

hour.  Lewis was pronounced dead at the scene.  Lewis's family sued the County, its sheriff's department, and the deputy under 42 U.S.C. § 1983, claiming that the deputy's conduct violated Lewis's right to substantive due process.  Id. at 837.  The case reached the Supreme Court on the issue of what level of culpability a law enforcement officer must reach to violate substantive due process in a pursuit case.  Id. at 839.

The Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983."  Id. at 854.  Analogizing a high-speed chase to a prison riot, the court noted that in neither instance was there time for a responding officer to ponder, and thus deliberate indifference was an inappropriate standard for determining whether the officer's conduct shocked the conscience.  Id. at 851-54.  A higher degree of culpability was required because the officer was "supposed to act decisively and show restraint at the same moment."  Id. at 853.

In this case, Oliveira contends that the district court erred by applying Rodriguez's medical-standards test instead of determining whether Oliveira's conduct shocked the conscience under Lewis.  We conclude that the district court did not err by applying Rodriguez, as that case imposed a rule for determining

20

when an involuntary commitment violates substantive due process that is consistent with Lewis's shocks-the-conscience framework. In other words, a physician's decision to involuntarily commit a mentally ill person because he poses a danger to himself or others shocks the conscience, thereby violating substantive due process, when the decision is based on "substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community." Rodriquez, 72 F.3d at 1063. The principles enunciated in Lewis support our conclusion.

First, Rodriquez's medical-standards test does not impose constitutional liability for conduct that is merely negligent. In requiring that the commitment decision be the product of criteria substantially below those generally accepted in the medical community, Rodriquez imposes liability for conduct that is at least grossly negligent. Lewis does not preclude liability for such middle-range culpability. See 523 U.S. at 849.

Oliveira contends, however, that the district court found his conduct to be no more than negligent, and thus even if Rodriquez provides the applicable rule, the district court erred in applying the rule in this case. He points to the district court's language granting him summary judgment on Bolmer's false imprisonment claim. According to Oliveira, since the false

21

imprisonment claim was based on the same conduct as the substantive due process claim, the court's finding precluded liability on the latter. Oliveira reads too much into the district court's language. The court found that Bolmer's allegations "could support a finding of negligence" or "indifference," but not "malice or wantonness" sufficient to overcome sovereign immunity. Bolmer v. Oliveira, 570 F. Supp. 2d 301, 317 (D. Conn. 2008). This does not constitute a finding that Bolmer's allegations could show negligence but nothing more.

Second, the circumstances of an involuntary commitment support the application of Rodriquez's medical-standards test. See Lewis, 523 U.S. at 850. Like the New York law in Rodriquez, the Connecticut statute governing Bolmer's emergency involuntary commitment requires that the decision to commit be made by a physician. See Conn. Gen. Stat. § 17a-502. As we stated in Rodriquez, "[i]mplicit in [the statute's] requirement that the decision be made by a physician is the premise that the decision will be made in accordance with the standards of the medical profession." 72 F.3d at 1063. A substantial departure from those standards shocks the conscience because it removes any "reasonable justification" for intentionally depriving the person of his or her liberty. Lewis, 523 U.S. at 846 (emphasis added); see also Youngberg v. Romeo, 457 U.S. 307, 323 (1982) (holding

22

that a mentally disabled person could show a violation of substantive due process if the decision to deny him training and rehabilitation "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment").

Finally, the post-Lewis case law does not convince us that Rodriguez should be overruled. The Ninth Circuit has adopted Rodriguez's objective medical-standards analysis, Jensen v. Lane County, 312 F.3d 1145, 1147 (9th Cir. 2002), and we have consistently applied it, see Olivier, 398 F.3d at 188-91; Hogan v. A.O. Fox Mem. Hosp., No. 08-5315-cv, 2009 WL 2972870, at *2 (2d Cir. Sept. 18, 2009) (summary order). We are aware that other circuits have employed different analyses. See Benn v. Univ. Health Sys., Inc., 371 F.3d 165, 174-75 (3d Cir. 2004) (explaining that, "in view of the events that led to [the plaintiff's] commitment and the steps taken after his arrival at [the psychiatric hospital, the doctors'] conduct was not conscience-shocking"); James v. Grand Lake Mental Health Ctr., Inc., No. 97-5157, 1998 WL 664315, at *7, *10 (10th Cir. Sept. 24, 1998) (order and judgment). However, the reasoning of those cases does not persuade us that Rodriguez is no longer good law.

23

Oliveira points to Monaco v. Hogan, 576 F. Supp. 2d 335 (E.D.N.Y. 2008), in which the district court discussed Rodriguez but concluded that a commitment decision shocked the conscience under Lewis only if the committing physicians acted with deliberate indifference. Id. at 350-51. We disagree with the Monaco court's reasoning, as it failed to perceive that Rodriguez itself measures what is conscience shocking in this context. We do not read Lewis to require a subjective analysis of the physician's state of mind.[2]

Having concluded that Rodriguez remains the proper test for determining whether an involuntary commitment shocks the conscience, we find no error here in the district court's application of Rodriguez. The court determined that genuine issues of material fact existed both as to the facts surrounding Bolmer's commitment and the medical standards that should have governed Oliveira's conduct. Because the qualified immunity issue turns on whether these facts show a substantive due process violation, we agree that they are material. We lack jurisdiction

---

[2] We do not mean to exclude the possibility that a committing physician's improper motive or state of mind could on its own shock the conscience. See Olivier, 398 F.3d at 189-90 (discussing but declining to decide whether a commitment decision could comport with medical standards but nevertheless violate substantive due process because the committing physician acted with "improper motive or intent").

24

to examine whether the factual issues are genuine.  See Jones, 465 F.3d at 55.

Oliveira raises two additional challenges to the district court's denial of his qualified immunity claim.  He argues first that he could not have violated Bolmer's right to substantive due process because Danbury Hospital staff members, and not Oliveira, were responsible for Bolmer's commitment.  Because Connecticut law required the hospital to conduct its own examination of Bolmer within 48 hours of his admission, see Conn. Gen Stat. § 17a-502(b), and presumably it did so, Oliveira contends that the hospital's decision to continue Bolmer's commitment absolves him of responsibility.  This argument is specious.  Oliveira examined Bolmer, determined that he was dangerous and should be committed, and signed the Emergency Certificate ordering Bolmer committed "for no more than 15 days care and treatment in a mental hospital."  At the very least, Oliveira is responsible for depriving Bolmer of his liberty until the time of the hospital's determination.

Oliveira also claims that Bolmer's substantive due process claim cannot succeed because a more specific constitutional provision – the Fourth Amendment – applies.  We decline to consider this argument as it was raised for the first time in

Oliveira's reply brief.  See McCarthy v. S.E.C., 406 F.3d 179, 186 (2d Cir. 2005).

Because we cannot conclude as a matter of law that Oliveira did not violate Bolmer's right to substantive due process, we affirm the denial of summary judgment on Oliveira's qualified immunity defense.

**III. Eleventh Amendment Immunity**

The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has been interpreted also to bar federal suits against state governments by a state's own citizens . . . ."  Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 236 (2d Cir. 2006).

Eleventh Amendment immunity is not, however, immutable.  Under section five of the Fourteenth Amendment, Congress can abrogate the immunity to enforce the substantive rights guaranteed by the Fourteenth Amendment.  See Tennessee v. Lane, 541 U.S. 509, 518 (2004).  Congress has unambiguously purported

26

to abrogate states' immunity from Title II claims. See 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."). The extent to which Congress's abrogation is a constitutional exercise of its section five authority has been the subject of much debate – some of it esoteric.

In Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98 (2d Cir. 2001), we held that Congress had exceeded its section five authority in enacting Title II, but that Title II suits could be limited to circumstances in which it had not. See id. at 110-11. We recognized that section five grants Congress the authority to abrogate states' immunity as to conduct that actually violates the Fourteenth Amendment, as well as "'a somewhat broader swath of conduct'" that is constitutional but which Congress may prohibit in order to remedy or deter actual violations. Id. at 108 (quoting Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 365 (2001)). We also recognized that this latter, prophylactic authority is "subject to the requirement that there be 'congruence and proportionality between the [violation] to be prevented or remedied and the means adopted to that end.'" Id. (quoting City of Boerne v. Flores, 521 U.S. 507,

27

520 (1997)). We therefore formulated a rule to limit Title II suits to these two species of conduct.

In formulating this rule, we treated the plaintiff's Title II claim as grounded in the Equal Protection Clause of the Fourteenth Amendment. See id. at 109 (discussing the Supreme Court's Equal Protection analysis in Garrett, 531 U.S. 356). Since the Equal Protection Clause only proscribes disparate treatment of the disabled that is not rationally related to a legitimate government purpose, id., Title II suits could be maintained against states only if the plaintiff showed "that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability," id. at 111. And to "lessen a plaintiff's difficulty in establishing animus relative to what would be demanded under traditional rational basis review," a plaintiff could "rely on a burden-shifting technique similar to that adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), or a motivating-factor analysis similar to that set out in Price Waterhouse v. Hopkins, 490 U.S. 228, 252-58 (1989)." Garcia, 280 F.3d at 112 (citations amended). This rule, we reasoned, would reach conduct that failed rational basis review and therefore violated Equal Protection, as well as conduct that did not violate Equal Protection but which Congress

28

could prohibit pursuant to its prophylactic authority. See id. at 111-12.

Following our decision in Garcia, the Supreme Court decided several cases concerning the extent to which Congress's abrogation of Eleventh Amendment immunity in Title II of the ADA is constitutional. First, in Tennessee v. Lane the Court upheld Congress's abrogation in the context of courtroom accessibility. 541 U.S. at 531. It reasoned that in enacting Title II, Congress sought to enforce not only Equal Protection, but also "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." Id. at 522-23. With regard to courtroom accessibility, these guarantees included litigants' rights under the Due Process Clause of the Fourteenth Amendment. See id. at 523. Thus, Title II was not wholly premised on discrimination against the disabled that violates the Equal Protection Clause. Among the decisions cited in support of Title II's enactment were cases concerning the mentally disabled.

> The historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled persons by state agencies in a variety of settings, including [1] unjustified commitment, e.g., Jackson v. Indiana, 406 U.S. 715 (1972); [2] the abuse and neglect of persons committed to state mental health hospitals, Youngberg v. Romeo, 457 U.S. 307 (1982); and [3] irrational discrimination in zoning decisions [concerning a home for the mentally retarded], Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985).

29

Lane, 541 U.S. at 524-25 (footnote omitted and citations amended).

Next, in United States v. Georgia, 546 U.S. 151 (2006), the Court reaffirmed that, "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." Id. at 159. Noting, however, that members of the Court had disagreed regarding the scope of Congress's prophylactic authority, and that it was unclear what conduct the plaintiff intended to allege in support of his Title II claims, the Court remanded for the lower court to determine,

> on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Id. at 158-59.

Here, DMHAS contends that the district court erred by not requiring that Bolmer show discriminatory animus or ill will under Garcia. Bolmer responds that Garcia only applies to Title II claims based on Equal Protection, and since his claim is based solely on substantive due process, the district court properly

30

disregarded Garcia and decided the issue under Georgia. We agree with Bolmer.[3]

The threshold question is whether Congress's abrogation may be justified by its enforcement of the substantive due process right not to be involuntarily committed absent a danger to self or others. Under Lane, we think the answer to this question is yes. The Court in Lane found that rights guaranteed by the Due Process Clause were among the "variety of other basic constitutional guarantees" Congress sought to enforce in Title II. 541 U.S. at 522-23. And the history of unconstitutional conduct reflected in Title II includes unconstitutional treatment of the mentally disabled, including their unjustified commitment. See id. at 524-25.

The next question is whether Garcia's discriminatory animus test is applicable where Congress's abrogation of Eleventh Amendment immunity is justified, if at all, by its enforcement of the substantive due process right not to be involuntarily committed absent a danger to self or others. Garcia's discriminatory animus requirement was designed to reach Title II violations that also violate Equal Protection because they fail

---

[3] Given Bolmer's explicit rejection of any Equal Protection basis for his Title II claim (Br. of Plaintiff-Appellee at 38-39 & n.9), we decline amici's request to re-examine Garcia in light of Lane and Georgia (Br. of Amici at 10-15).

rational-basis review, as well as the broader swath of constitutional conduct Congress could prohibit as necessary to remedy and deter Equal Protection violations. See Garcia, 280 F.3d at 111-12. The test for whether an involuntary commitment violated substantive due process is not rational-basis review; rather, a commitment violates substantive due process if the decision was made "on the basis of substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community." Rodriquez, 72 F.3d at 1063. Whether or not Garcia survives Lane and Georgia, a question we do not reach, it is quite clear that Garcia's discriminatory animus requirement for Equal Protection-based claims cannot be applied to claims based solely on the substantive due process right Bolmer alleges was violated here, since the test for whether the constitution was violated in each case is distinct.

Having determined that Garcia is not applicable here, a question remains as to how to analyze Congress's abrogation of DMHAS's Eleventh Amendment immunity to Bolmer's Title II claim. Under Georgia, Congress's abrogation of DMHAS's Eleventh Amendment immunity to Bolmer's Title II claim is valid if DMHAS violated (1) Title II and (2) Bolmer's right to substantive due process. See 546 U.S. at 158-59. Because we cannot conclude as

32

a matter of law that DMHAS did not violate Title II or Bolmer's right to substantive due process, we affirm the denial of summary judgment as to this defense.

First, the reviewable facts may support Title II liability. To establish a violation of Title II, Bolmer must show that (1) he is a "qualified individual with a disability," (2) DMHAS is subject to the ADA, and (3) he was, "by reason of such disability, . . . excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity, or . . . subjected to discrimination by any such entity." 42 U.S.C. § 12132; see Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003). The first two elements are not in dispute. Bolmer contends that he has satisfied the third because DMHAS discriminated against him when it concluded, based on a stereotyped view of the disabled, that his relationship with Kaminski was a delusion, and committed him on the basis of that conclusion.

Both sides address the discrimination question under the mixed-motive discrimination framework erected in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). However, it is questionable whether Title II discrimination claims can proceed on a mixed-motive theory after the Supreme Court's decision in Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343 (2009), where the Court

33

held that the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., does not authorize a mixed-motive age-discrimination claim. 129 S. Ct. at 2350. Instead, age discrimination must be the "but-for" cause of an adverse employment action for ADEA liability to attach. Id. Ultimately, we need not determine whether Bolmer may proceed with his Title II claims on a mixed-motive theory, because even if Gross requires him to show that DMHAS's discriminatory stereotyping was the "but-for" cause of his commitment, we cannot conclude as a matter of law that he has failed to satisfy this more stringent causation standard.

According to Bolmer, he had a sexual relationship with Kaminski that no one would believe had occurred. GDMHA staff incorrectly concluded that the relationship was a delusion, and made Bolmer return to the GDMHA facility for an unnecessary mental examination. Upon his return, Bolmer spoke loudly but did not yell. Oliveira, who was unfamiliar with Bolmer, conducted a mental examination that was non-individualized and cursory at best; it involved little questioning and lasted only five minutes. Throughout the examination, GDMHA staff looked at Bolmer as if he were crazy. Oliveira rolled his eyes. Bolmer attempted to convey that he was not angry by stating that "if [he] was really angry that [he] would pick up the chair in the

34

room and throw it." Oliveira then ordered him committed to Danbury Hospital. The hospital held Bolmer for two days, releasing him only after discovering evidence on Bolmer's cell phone indicating that his relationship with Kaminski was not a delusion.

These allegations could support a conclusion that (1) Bolmer had a sexual relationship with Kaminski, (2) DMHAS staff incorrectly assumed that the relationship was a delusion based on a stereotyped view of the mentally ill, and (3) but for this assumption, Bolmer would not have been committed. Thus, even if Gross prohibits Bolmer from proceeding on a mixed-motive theory, he has adequately alleged discrimination that was the but-for cause of his commitment.

Second, as discussed above, the reviewable facts could show that DMHAS employee Oliveira violated Bolmer's right to substantive due process, thereby satisfying the second prong of Georgia.

Finally, as Bolmer's success on the first and second prongs of Georgia would make an analysis under the third prong unnecessary, we decline to address that prong here.

In sum, we hold with regard to DMHAS's Eleventh Amendment immunity defense that (1) Garcia is not applicable when Congress's abrogation is supported by its enforcement of the

35

substantive due process right not to be involuntarily committed absent a danger to self or others; and (2) under <u>Georgia</u> and <u>Lane</u>, Congress validly abrogated states' Eleventh Amendment immunity where the same conduct by the defendant violated both Title II and substantive due process.  Because we cannot conclude as a matter of law that DMHAS did not violate Title II or Bolmer's right to substantive due process, we affirm the denial of summary judgment on this defense.

**CONCLUSION**

For the foregoing reasons, we DISMISS the appeal to the extent it (1) contests the district court's determination that Bolmer put forth sufficient evidence of the relevant medical standards to create a material issue of fact, and (2) argues that Bolmer abandoned his Fourth Amendment claim.  We AFFIRM the denial of summary judgment on Defendants-Appellants' qualified immunity and Eleventh Amendment immunity defenses.