STEFAN R. UNDERHILL, District Judge,
dissenting in part:
The allegations in this case are staggering: According to plaintiffs, the former Governor of New York and the head of the State Parole Commission conspired to convert hundreds of indeterminate sentences into determinate sentences of life in prison without the possibility of parole. The complaint alleges that the defendants adopted an unwritten policy to deny parole to all prisoners convicted of class A-l felonies, no matter their record of rehabilitation or fitness for release. They did so to advance their own “political and economic agenda.” First Amended Compl. ¶ 2. Their purported scheme circumvented the commands of both legislators and judges; the legislature instructed the Parole Board to consider eight factors when determining whether offenders are ready to rejoin their communities and judges imposed open-ended sentences believing that the Parole Board would do so. But the Governor’s purported policy flouted these directives. It allegedly turned parole hearings into sham proceedings — inmates could present evidence and call witnesses, but they would waste their breath because the policy tied the commissioners’ hands. As a result, the Governor and the Parole Board consigned hundreds of people to life in prison.
*118 At least, that is what the complaint requires us to assume.[1] But the majority downplays these factual allegations in the complaint and reframes the plaintiffs’ legal claim for relief. Because, when viewed in the proper light, the complaint states a plausible claim for a violation of substantive due process, I respectfully dissent. The heart of plaintiffs’ claim is that “[sjince 1995 the Board of Parole has been issuing parole determinations pursuant to an unofficial policy of denying parole release to prisoners convicted of A-l violent felony offenses solely on the basis of the violent nature of such offenses and thus without proper consideration to any other relevant or statutorily mandated factor.” First Amended Compl. ¶ 31. Plaintiffs allege that the unofficial policy “precludes and/or substantially curtails the Parole Board’s full and meaningful consideration of the ... statutorily mandated factors,” and results in “parole decisions for prisoners serving sentences for A-l violent felonies [based] upon impermissible political and economic factors.” Id. ¶ 34. Somehow the majority reads these allegations as asserting no more than that “the Board has overvalued the severity of the crime at the expense of other statutory considerations,” Majority Op. at 115 (emphasis in original), and thus as no more than a complaint about the manner in which the Parole Board has exercised its discretion.
If the plaintiffs’ claimed only that the Parole Board placed too much emphasis on one of the statutory factors when making parole decisions or otherwise violated state law, their claim would be meritless. But the plaintiffs do not claim that the Parole Board merely placed heavy weight on one factor while also considering all of the required factors. Instead, plaintiffs claim that the Parole Board based release decisions “solely on the basis of the violent nature of such offenses and thus without proper consideration to any other relevant or statutorily mandated factor.” First Amended Compl. at ¶ 31 (emphasis supplied). When combined with the allegation that the alleged policy sought to further a political and economic agenda, plaintiffs state a claim that they have been denied parole for arbitrary and impermissible reasons, a cause of action implicitly recognized by this Court. Mathie v. Dennison, No. 06 Civ. 3184, 2007 WL 2351072 at *6, 2007 U.S. Dist. LEXIS 60422 at *15 (S.D.N.Y. Aug. 16, 2007), aff'd, 381 Fed.Appx. 26 (2d Cir.2010); Rodriguez v. Greenfield, 7 Fed.Appx. 42, 44-45 (2d Cir. 2001) (“Our decision[s] [do] not answer the question raised in this case because in considering Rodriguez’s 1998 parole denial, the Parole Board never considered a number of these factors ... as it was mandated to consider by state law.”). In the present procedural posture, this Court has no basis to hold that the Parole Board decisions over the pertinent period of time were not arbitrary and impermissible.[2]
The majority suggests that the allegations of the amended complaint fail to state a claim for a violation of substantive due process. I believe such a claim has been stated, and I am aware of no decision of this Court that precludes such a claim as a matter of law. The Due Process Clause’s substantive dimension “bar[s] certain government actions regardless of the fairness *119 used to implement them.” Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). It prevents officials from “abusing [their] power, or employing it as an instrument of oppression.” Cnty. of Sacramento v. Lewis, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting DeShaney v. Winnebago Cnty. Dept. of Social Servs., 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).
When a member of the executive branch is charged with violating substantive due process, “the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.” Lewis, 523 U.S. at 847 n. 8, 118 S.Ct. 1708. The standard is admittedly “open-ended”; both the Supreme Court and this Court have called for “judicial self-restraint” whenever a court confronts a substantive due process claim. Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); Local 342, Long Island Pub. Sere. Emp. v. Town Bd. of Huntington, 31 F.3d 1191, 1196 (2d Cir.1994). Courts, then, engage in a fact-intensive analysis attuned to “the state of mind of the government actor and the context in which the action was taken.” O’Connor v. Pierson, 426 F.3d 187, 203 (2d Cir.2005).
Here, several aspects of the defendants’ purported scheme remove it from the boundaries of decency and render it more than just an unfortunate policy choice. First, the defendants allegedly acted with the specific intent of depriving prisoners of their opportunity to win release. As Lewis made clear, only deliberate decisions to cause harm fall clearly within the scope of the Due Process Clause’s protection. In the words of the Court, “[c]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to give rise to the conscience-shocking level.” Lewis, 523 U.S. at 848,118 S.Ct. 1708.
Second, executive officials have no justifiable interest in circumventing mandated hearings or ignoring statutory criteria. In a similar context, this Court has held that an official loses legitimacy when he acts without regard for accepted standards of practice. In Bolmer v. Oliveira, 594 F.3d 134 (2d Cir.2010), a doctor involuntarily committed a person to a psychiatric facility without completing a required exam. The Court held that a physician’s decision to depart from customary procedures and criteria could shock the conscience because, in part, “a substantial departure from those standards ... removes any ‘reasonable justification’ for intentionally depriving the person of his or her liberty.” Id. at 142. Here, defendants’ alleged policy in effect resentenced hundreds of offenders to life in prison without the possibility of parole and without consideration of an individual’s record according to statutorily-mandated factors.
Third, this is not a case in which an executive official acted within his discretion to solve a difficult policy problem. New York Executive Law § 259(i) allows the Parole Board to weigh factors militating for and against parole as it sees fit. But the Parole Board must weigh all statutory factors. See King v. New York State Div. Parole, 83 N.Y.2d 788, 610 N.Y.S.2d 954, 632 N.E.2d 1277 (1994). The criteria prescribed in New York Executive Law § 259(i), if applied properly, are designed to separate offenders who pose a risk to their communities from offenders who have developed the strength of character to return home without falling back into a life of crime. Thus, this is not a statute that contains conflicting commands requiring an executive to quickly fill gaps in order to ensure that an administrative regime functions smoothly. See, e.g., Lorn *120 bardi v. Whitman, 485 F.3d 73, 85 (2d Cir.2007) (reasoning that conduct did not shock the conscience because officials merely “allocat[ed] ... risk” when faced with an emergency).
Last, and, most important, the Governor’s alleged scheme would offend one of the most fundamental principles in our legal system — that the executive cannot confine a person without lawful authority. As the Supreme Court has noted, the Framers constructed the Constitution to “guard against the abuse of monarchial power,” and for that reason they cabined the executive’s ability to “imprison ... contrary to the law of the land.” Bournediene v. Bush, 553 U.S. 723, 740, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). That concern animates many of the bedrock provisions of our Constitution, including the Suspension Clause, the Sixth Amendment Right to Counsel, and the Right to a Trial by Jury. See U.S. Const, art. I, § 9, cl. 2; U.S. Const, amend. VI. Although those provisions do not apply in this case, their existence and purpose should inform any analysis of the Due Process Clause’s scope; in a related context, the Supreme Court has reasoned that the Clause’s breadth depends upon “our Nation’s history, legal traditions, and practices.” Washington v. Glucksberg, 521 U.S. 702, 710, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (outlining method for identifying a fundamental right protected by substantive due process). I can imagine no deeper tradition than our nation’s longstanding commitment to ensuring that the government cannot condemn a man to life behind bars without notice or cause.[3] See, e.g., Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (holding that indefinite detention of deportable aliens violates substantive due process); Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (holding that substantive due process bars state from detaining a person acquitted by reason of insanity after he has been treated and judged competent). Yet, that is exactly what the Governor’s alleged policy would do: People sentenced to prison but guaranteed the opportunity to petition for their freedom— some in reliance on explicit plea deals— would find themselves facing life sentences without any hope of release.
The majority asserts that a blanket policy to deny parole to all violent offenders without consideration of the required statutory factors is not arbitrary in the constitutional sense and that my contrary view relies only on a violation of state law. I believe that criticism is misplaced. In my view, the egregiousness — and the constitutional dimension — of the conduct does not disappear merely because that conduct was undertaken by the executive rather than by the legislature. Although the plaintiffs’ ex post facto claim fails because the alleged policy is “not [a] ‘law[ ]’ within the meaning of the ex post facto clause,” Barna v. Travis, 239 F.3d 169, 171 (2d Cir.2001), the alleged policy is plainly un *121 constitutional. There can be no doubt that the New York legislature could not constitutionally pass a statute retroactively converting all indeterminate sentences for violent felons into determinate sentences of life without the possibility of parole. Weaver v. Graham, 450 U.S. 24, 30-31, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (“[E]ven if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the [Ex Post Facto] Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.”). Nonetheless, the majority holds that the executive can accomplish the same result for arbitrary reasons without engaging in egregious conduct violative of substantive due process.
No one can deny that plaintiffs in this case have committed despicable crimes. But according to New York state law they may rehabilitate themselves sufficiently to merit release. The defendants have an obligation to follow the statutory process that affords offenders an opportunity to show that they have changed. Thus, if plaintiffs’ claims are true, the defendants conspired to ignore statutory commands so that they could accomplish by unofficial policy what they could not constitutionally accomplish legislatively: the transformation of hundreds of indeterminate sentences into sentences of life imprisonment without the possibility of parole.[4] Such an intentional abuse of power shocks the conscience.
Conspiracy theories, of course, are incredibly difficult to prove, and rightly so. I have little doubt that plaintiffs would have found it quite difficult to present evidence from which a jury would infer that the Governor and the Chair of the Parole Board made a backroom deal designed to thumb their noses at the other branches of government and unlawfully condemn an entire class of offenders to life in prison. But we are not sitting as a jury or even reviewing a ruling granting summary judgment. We are reviewing a ruling on a motion for judgment on the pleadings, and must accept all well-pleaded allegations of the complaint as true. Under that required standard, plaintiffs’ amended complaint states a substantive due process claim upon which relief can be granted.
Accordingly, I respectfully dissent from the implicit holding that the amended complaint fails to state a substantive due process claim.

. Attached to the complaint are statistics showing that violent felons were granted parole at a rate of 28% in 1993-94, 14% in 1995-96, and no more than 4% in 2000-01, 2001-02 and 2002-03. Those numbers, which we must assume to be accurate, support the plausible existence of the claimed unofficial policy.

. The record does include evidence supportive of plaintiffs' claims, but the procedural posture of the case prevents me from relying on it.

. I express no view regarding the adequacy of New York's parole hearings. Greenholtz v. Nebraska famously held that a prisoner has no liberty interest in parole. 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). Although I am skeptical of that decision's logic — the Court reasoned that a "statutory expectation” in freedom is somehow qualitatively different than an interest in it- — I need not revisit that question today. The question here is not whether the prescribed procedures governing parole decisions are adequate to protect a cognizable entitlement. Rather, the question is whether a particular method of executive enforcement that results in a dramatic loss to a class of citizens violates the Constitution's guarantee of substantive due process. To answer that question, courts look to traditions that undergird the Constitution, and take those purposes into account when interpreting ambiguous provisions.

. Such a consequence is especially troubling in cases where a defendant traded his right to trial for a lighter sentence that included the opportunity for parole. Cf. INS v. St. Cyr, 533 U.S. 289, 321-23, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (holding that an immigration law could not be interpreted to apply retroactively if it would unsettle or frustrate defendants’ reasonable expectations at the time they pled guilty).