**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2013

(Argued:    September 24, 2013          Decided:    May 16, 2014)

Docket No. 12-4165-cv

-----------------------------------------------------------X

KRATON McGUGAN,

*Plaintiff-Appellant*,

v.

LINDA L. ALDANA-BERNIER, M.D., personally, SHUSHAN HOVANESIAN,
M.D., personally, RABBI MAHMUDUR, M.D., personally, FEMI ABIOYE, R.N.,
personally, JAMAICA HOSPITAL MEDICAL CENTER,

*Defendant-Appellees*,

NEW YORK CITY, GAMALIEL BONILLA, personally, KENNETH BOGLE,
personally, Port Authority Police Department Officer ANGERHAUSER, Shield
Number 2653, personally, and THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY,

*Defendants*.[*]

-----------------------------------------------------------X

---

[*] The Clerk of Court is directed to amend the official caption to conform to the
caption above.

1

Before:      LEVAL, HALL, and LOHIER, *Circuit Judges*:

Plaintiff Kraton McGugan appeals from the judgment of the United States District Court for the Eastern District of New York (Melançon, *J.*) dismissing her complaint against Defendant-Appellees for failure to state a claim under 42 U.S.C. § 1983 and § 504 of the Rehabilitation Act.  The Court of Appeals (Leval, *J.*) concludes that McGugan failed to allege state action on the part of Defendant-Appellees and failed to allege discrimination on the basis of a disability under § 504 of the Rehabilitation Act.  The judgment of the district court is therefore AFFIRMED.

WILLIAM M. BROOKS, Mental Disability Law Clinic, Touro College, Jacob D. Fuchsberg Law Center, Central Islip, NY, for *Plaintiff-Appellant Kraton McGugan*.

BRIAN E. LEE, Ivone, Devine & Jensen, LLP, Lake Success, NY, for *Defendant-Appellee Shushan Hovanesian, M.D.*

BRUCE M. BRADY, Callan, Koster, Brady & Brennan LLP, New York, NY (Stephen J. Barrett, *on the brief*), for *Defendant-Appellee Linda L. Aldana-Bernier, M.D.*

ARJAY G. YAO, Martin Clearwater & Bell LLP, New York, NY (Kenneth R. Larywon and Gregory J. Radomisli, *on the brief*), for *Defendant-Appellees Jamaica Hospital Medical Center, Rabbi Mahmudur, M.D., and Femi Abioye*.

LEVAL, *Circuit Judge*:

Plaintiff Kraton McGugan appeals from the judgment of the United States District Court for the Eastern District of New York (Melançon, *J.*) dismissing her complaint. McGugan brought suit against Defendants Jamaica Hospital Medical Center and four of its employees — Linda L. Aldana-Bernier, M.D., Shushan Hovanesian, M.D., Rabbi Mahmudur, M.D., and Femi Abioye, R.N. — (collectively, "Defendants") for their alleged role in forcibly medicating and hospitalizing McGugan.[1] The Defendants moved to dismiss McGugan's complaint. The district court granted the motions, concluding that McGugan failed to state a claim against the Defendants (1) under 42 U.S.C. § 1983, because she failed to allege state action, and (2) under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, because she failed to allege discrimination on the basis of disability against an otherwise qualified individual. The district court declined to exercise supplemental jurisdiction over McGugan's state law claims against the Defendants. On appeal, McGugan contests only the district court's conclusion that she failed to state a claim against Defendants under § 1983 and § 504.

---

[1] McGugan also sued five other defendants who are not relevant to this appeal.

We agree with the district court that McGugan failed to allege state action for the purposes of her § 1983 claims and that she failed to allege actionable discrimination for the purposes of her § 504 claim. We therefore affirm the judgment of dismissal.

## BACKGROUND

**I.    McGugan's Involuntary Hospitalization**

The facts, as alleged in McGugan's complaint, are as follows.

In the early morning of July 24, 2008, McGugan boarded a red-eye flight from San Francisco to New York City (John F. Kennedy International Airport) to visit her boyfriend, Chris Tulipanov. On the plane, McGugan began coughing uncontrollably. She asked to be moved to a less crowded area of the plane to avoid bothering neighboring passengers, but a flight attendant told her to return to her seat. Still coughing, McGugan renewed her request "using stronger language." Second Am. Compl. ¶ 29. The flight attendant then moved another passenger, leaving McGugan in a row of seats to herself.

McGugan fell asleep and did not wake up until after the plane had landed and all the other passengers had deplaned. When she woke up, three police officers were standing over her. They took her to a police station at the airport

for questioning and handcuffed her to the wall. After McGugan answered the officers' questions, an unidentified man informed her that she would be taken to the Jamaica Hospital Medical Center ("JHMC"). JHMC is a private hospital that receives federal funding and is licensed by the New York State Office of Mental Health ("OMH") to provide psychiatric services.

McGugan's boyfriend then accompanied her in an ambulance to the JHMC. During their ride to the JHMC, one of two government officials (defendants who are not parties to this appeal) injected McGugan with medication without her consent, after erroneously determining that she was a danger to others. The medication sedated her. When she woke up, she was restrained to a hospital bed.

When McGugan arrived at the JHMC emergency room, and while she was still sedated, the late Dr. Bacares (not a party to this action) wrote an order for the forcible administration of medication on an immediate basis for McGugan. Defendant Dr. Mahmudur also wrote an order to forcibly administer those medications on an "as needed[] basis for severe agitation." *Id.* ¶ 51. Pursuant to those medication orders, Defendant Abioye injected McGugan multiple times with a combination of Haldol, Benadryl, and Ativan.

Beginning on July 25, 2008, the staff of the JHMC attempted to gather information about McGugan. During the information gathering process, clinical staff learned that McGugan was dating someone named "Chris." For reasons that are not explained in McGugan's complaint, they mistakenly believed McGugan was referring to "Kris Dickman," who was her ex-boyfriend. JHMC staff called Dickman. He told them that he was not dating McGugan and that McGugan had thrown a metal object at him, requiring him to seek medical attention. From this conversation, clinical staff believed that McGugan "was suffering from delusions of a romantic nature." *Id.* ¶ 67.

Defendant Dr. Aldana-Bernier performed a psychiatric evaluation on McGugan while McGugan was still sedated. Based on the evaluation, on Dickman's statements, and on McGugan's apparent uncooperative refusal to answer questions, Dr. Aldana-Bernier certified McGugan as having a mental illness likely to result in substantial harm to herself or others, thus rendering McGugan subject to involuntary admission to the JHMC under New York Mental Hygiene Law § 9.39. McGugan alleges that Dr. Aldana-Bernier's assessment of McGugan's dangerousness was not "minimally competent" because she failed to ask McGugan relevant questions, failed to recognize that

McGugan's "uncooperative" behavior was merely the result of her heavy sedation, and failed to perform an appropriate risk assessment. *Id.* ¶¶ 66-79. McGugan also alleges that Dr. Aldana-Bernier performed a deficient assessment because she stereotyped McGugan as dangerous based on her perception that McGugan was mentally ill.

On July 26, 2008, Defendant Dr. Hovanesian certified McGugan for further confinement under § 9.39, concluding that McGugan was a danger to herself or others on the basis of Dickman's statements. McGugan alleges that Dr. Hovanesian's certification was also flawed in that she did not try to corroborate Dickman's statements with McGugan. McGugan remained confined in JHMC until July 30, 2008.

McGugan alleges that had any of the defendants performed their duties properly, they would have realized that she was never a danger to herself or others and that she should never have been certified for forcible sedation or involuntary hospitalization.

**II.    New York State's Regulatory Scheme for Civil Commitment**

OMH has developed a regulatory framework for the evaluation, detainment, and treatment of individuals deemed to be mentally ill and

7

dangerous.  Except in rare circumstances, OMH has delegated the authority to civilly commit individuals to local hospitals — both public and private. Specifically, OMH has divided the state into "catchment areas," each of which is covered by a designated hospital.  Anyone deemed to potentially require psychiatric inpatient care is taken to the hospital covering the catchment area where he or she is located.  The hospital then determines whether the individual requires inpatient care — in the case of candidates for civil commitment, by evaluating whether they pose a danger to themselves or others.  If the individual merely requires inpatient care for the short term, the hospital will provide that care (voluntarily or, if necessary and appropriate, involuntarily).  If he or she requires long-term inpatient psychiatric care, then he or she will be transferred to a hospital operated by OMH.  The civil commitment system is thus coordinated among local governments, private entities, and OMH.

JHMC is a private hospital responsible for the catchment area covering John F. Kennedy International Airport.

**DISCUSSION**[2]

This appeal presents two questions: (1) whether private health care professionals or a private hospital engage in state action when they forcibly medicate and hospitalize someone deemed to have a mental illness likely to result in serious harm; and (2) whether their failure to adequately assess that risk of harm according to proper medical standards constitutes discrimination under the Rehabilitation Act if the assessment is based on drawing stereotyped inferences from medical conditions that are appropriately considered as part of a proper assessment. Because we conclude that both questions must be answered in the negative, we affirm the judgment of the district court.

**I.    State Action**

To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law. *See* 42 U.S.C. § 1983; *Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004). A private entity acts under color of state law for purposes of § 1983 when "(1) the State compelled the conduct [the 'compulsion test'], (2) there is a sufficiently

---

[2] "We review de novo a district court's dismissal of a complaint under Rule 12(b)(6), accepting the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 40 (2d Cir. 2014) (citation omitted).

close nexus between the State and the private conduct [the 'close nexus test' or 'joint action test'], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State [the 'public function test']." *Hogan v. A.O. Fox Memorial Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 225, 257 (2d Cir. 2008)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

Here, the question is whether the forcible medication and hospitalization of McGugan by private health care providers can fairly be attributed to the state. Our resolution of this question is circumscribed by prior authority.

In *Doe v. Rosenberg*, 166 F.3d 507 (2d Cir. 1999), we considered a substantially identical question. Adopting the reasoning given by the district court in that case, we held that private health care professionals and a private hospital did not engage in state action when they involuntarily committed Doe to the psychiatric ward of Columbia Presbyterian Medical Center. *Id*. at 508. The

district court had analyzed each of the three tests for state action and found that none were satisfied. *Doe v. Rosenberg*, 996 F. Supp. 343, 351-55 (S.D.N.Y. 1998).

Because we see no basis for distinguishing or overruling *Rosenberg*, we are compelled to agree with the district court that McGugan has not alleged state action. Here, as in *Rosenberg*, the state endowed Defendants with the authority to involuntarily hospitalize (and medicate) the plaintiff, but it did not compel them to do so. Here, as in *Rosenberg*, although Defendants operated in a highly regulated context, the nexus between their challenged conduct and the state was insufficiently close for the conduct to qualify as state action. And finally, if the conduct in *Rosenberg* was not traditionally within the exclusive prerogative of the state, we see no reason why the conduct here would be.

McGugan urges us not to follow *Rosenberg* for four reasons, none of which has merit. First, she argues that this case is unlike *Rosenberg* because her involuntary hospitalization occurred after state actors transported her to JHMC. We do not see how these allegations, without more, could affect the state action analysis here. McGugan does not allege that the state actors requested, much less compelled JHMC or its staff to involuntarily hospitalize her. Nor can we discern any other reason why the conduct of private actors should become

11

attributable to the state merely because it follows in time the conduct of state actors.

Second, McGugan argues that, unlike in *Rosenberg*, she was hospitalized pursuant to a "complex scheme for evaluating, detaining and treating people with mental illness." McGugan has not, however, alleged a meaningfully different scheme than the one at issue in *Rosenberg*. In *Rosenberg*, the plaintiff was involuntarily hospitalized pursuant to a scheme where hospitals, subject to extensive regulation by the state, were permitted to detain patients certified to require involuntary treatment. *See Rosenberg*, 996 F. Supp. at 347. Here, McGugan was involuntarily hospitalized pursuant to a substantially similar scheme. The only material differences that McGugan alleges are that OMH has divided New York into catchment areas, which determine which patients are transported to which hospitals, and that private hospitals transfer patients in need of long-term involuntary care to state hospitals. Neither of these allegations meaningfully affects the state action analysis here. Nor does either suggest that the state had so close a nexus to the private conduct that "it [could] be said that the State is responsible for the specific conduct of which the plaintiff complains." *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis omitted).

12

Third, McGugan argues that *Rosenberg* is no longer binding precedent because of three intervening decisions. The first decision, *Fabrikant v. French*, 691 F.3d 193 (2d Cir. 2012), held that spaying and neutering pets without the owner's consent constituted state action because animal control is a state function and because the actions were taken in conjunction with the defendants' law enforcement and investigative activities. *Id.* at 208. The second decision, *Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000), held that a private hospital did not engage in state action when it refused to release an infant who tested positive for methadone in order to provide medical care, but that once the infant obtained medical clearance and the hospital continued to hold her in its role as part of the reporting and enforcement machinery for the state Child Welfare Administration, the hospital did engage in state action. *Id.* at 756-57. The third is a decision of another circuit, not binding in our circuit, which furthermore related to the laws of a state other than New York. *See Jensen v. Lane County*, 222 F.3d 570, 574-76 (9th Cir. 2000). None of these cases casts doubt on the validity of our holding in *Rosenberg*. None is inconsistent with *Rosenberg*.

Finally, McGugan argues that the reasoning of *Rosenberg* was flawed. We are not confident that McGugan has identified any fatal flaws in its reasoning.

But even if we thought so, *Rosenberg* is precedent of our Circuit, which is binding on us. Arguments that *Rosenberg* was wrongly decided should either be made in a petition to our Circuit for en banc review, or to the Supreme Court. *See United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). The arguments that the power to involuntarily hospitalize a patient should be considered as traditionally falling within the exclusive prerogative of the state are by no means frivolous. But, in light of *Rosenberg*, a panel of this Court is not at liberty to adopt them.

We conclude under the governing precedent of this Circuit that McGugan has failed to allege state action on the part of Defendants and that she has consequently failed to state a claim against them under 42 U.S.C. § 1983.

**II.    Section 504 Discrimination**

Circuit precedent is less clear with respect to McGugan's Rehabilitation Act claim. The crux of her claim is that JHMC discriminated in violation of § 504 of the Act by concluding that McGugan posed a risk of serious harm based on stereotyping persons who suffer from mental illness, rather than making a medically appropriate, individualized assessment.

Section 504 provides, in pertinent part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her

or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  The statute on its face prohibits three types of conduct that adversely affect a disabled person who is qualified for the statute's protection when the adverse conduct is motivated by the subject's disability.  Those are (1) exclusion from participation in a federally funded program or activity, (2) denial of benefits of a federally funded program or activity, and (3) subjection to discrimination under a federally funded program or activity.  McGugan alleges only the third type of conduct — subjection to discrimination under a federally funded program or activity.  The question we face is whether McGugan's complaint asserts an actionable claim that she was subject to "discrimination" by reason of her disability.

The term "discrimination" is potentially confusing in the context of medical treatment.  The word has two very different significations — one positive, the other pejorative.  In its positive sense, one discriminates by drawing distinctions that are relevant to the qualities or characteristics of the thing observed.  In its negative or pejorative sense, one discriminates by withholding advantages or inflicting disadvantages on the basis of irrelevant criteria, under

15

the influence of irrational bias.[3]  A doctor who administers a medical treatment to a patient (or withholds it) because the doctor's medical training leads her to conclude that the treatment is medically appropriate (or inappropriate) is practicing the benign form of discrimination.  This is true even if the doctor's medical understanding is flawed and her knowledge is deficient.  On the other hand, a doctor who inflicts or withholds a type of medical treatment for reasons having no relevance to medical appropriateness —  reasons dictated by bias rather than medical knowledge — is practicing the pejorative form of discrimination.  It is clear that the intention of the Rehabilitation Act in prohibiting discrimination is to prohibit the pejorative, and not the benign, form.  Thus a doctor may refuse to prescribe a particular treatment, which the disabled patient has requested, because of the doctor's assessment (based on an appraisal of the patient's medical condition) that the treatment would be harmful.  The doctor's refusal is not discrimination in violation of the statute, even if the doctor's medical analysis is flawed.  Such a decision may be malpractice, but it is

---

[3] *See Discrimination, n.*, Oxford English Dictionary Online, http://www.oed.com/view/Entry/54060?redirectedFrom=discrimination (last visited April 16, 2014) ("1. a. The action of perceiving, noting, or making a distinction between things. . . . 6. Unjust or prejudicial treatment of a person or group, esp. on the grounds of race, gender, sexual orientation, etc.").

not discrimination. Section 504 does not authorize a claim for malpractice. *See*

*Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (concluding that a similar

provision of the Americans with Disabilities Act "does not create a remedy for

medical malpractice").

Thus in *United States v. University Hospital*, 729 F.2d 144 (2d Cir. 1984), we

denied relief and ruled that "section 504 prohibits discrimination against a

handicapped individual only where the individual's handicap is unrelated to,

and thus improper to consideration of, the services in question." *Id.* at 156.

Under this standard, a medical decision to administer (or to withhold) a

treatment in the case of a disabled person could constitute discrimination that is

actionable under Section 504 if the decision was motivated by considerations that

are unrelated to proper medical decision-making about the case. But if the

decision was taken in consideration of medically pertinent standards, it will not

constitute actionable discrimination simply because the decision-maker

unreasonably gave unwarranted significance to some pertinent factor. This

result would still obtain, even if the decision was reprehensible and constituted

malpractice.

17

Our holding in *Green v. City of New York*, 465 F.3d 65, 78 (2d Cir. 2006), illustrates the other side of the coin from *University Hospital*. In *Green*, the plaintiff, who suffered from Lou Gehrig's disease, was forcibly hospitalized by the defendant medical personnel, in disregard of his objection. The plaintiff's physical paralysis, which disabled him from speaking, was irrelevant to his mental capacity to give or withhold consent to hospitalization. The defendants' decision to disregard the plaintiff's refusal, apparently based on an assumption having no basis in fact that Lou Gehrig's disease renders one incompetent to grant or withhold consent, was accordingly discriminatory in violation of Section 504. The ruling is entirely consistent with *University Hospital*, as the plaintiff's handicap was "unrelated to, and thus improper to consideration of" his competence to refuse hospitalization.

McGugan contends that *Green* supports her position. In both cases, she argues, the defendants, acting on the basis of stereotyping of persons with mental illness, improperly disregarded the plaintiffs' refusal to consent to the forcible treatment. But the two cases are importantly different for purposes of Section 504. In the present case, in order to determine whether to hospitalize McGugan, JHMC was required to evaluate whether she had a mental illness

18

likely to result in serious harm to herself or others. It concluded that she did, based on evidence that: (1) she did not know who she was presently dating; (2) she had acted violently toward her ex-boyfriend; (3) she could not or would not answer the questions she was asked during the evaluation; and (4) she was arrested by the police on the complaint of flight personnel upon landing at JFK Airport after a commercial flight. Even if, as McGugan alleges, this evidence is *not sufficient* to support a minimally competent conclusion, McGugan has not plausibly alleged that the decision was based on improper considerations, unrelated to determining whether she had a mental illness likely to result in serious harm to herself or others. Accordingly, while she may have alleged medical malpractice, she has not alleged discrimination as required to state a claim under § 504. McGugan's case is fundamentally different in this regard from *Green*. While the factors that led the *Green* defendants to disregard Green's refusal of treatment were irrelevant to his competence to grant or withhold consent, the factors motivating the defendants in this case were pertinent and relevant, even if the defendants attributed excessive significance to them.

McGugan also cites *Bolmer v. Oliveira*, 594 F.3d 134 (2d Cir. 2010), in support of her claim. *Bolmer* is more difficult to understand and distinguish.

The appeal in *Bolmer* was in part from the district court's denial of a state agency's motion for summary judgment seeking to dismiss the plaintiff's claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, on the basis of Eleventh Amendment immunity. The court undertook to determine whether the plaintiff's evidence supported an actionable claim under Title II, which for certain purposes is treated as substantially identical to § 504 of the Rehabilitation Act.[4] The plaintiff, who suffered from bi-polar disorder,[5] claimed the defendants had violated the ADA in ordering him involuntarily committed. The plaintiff argued that the defendants' refusal, based on his mental illness, to credit his accurate assertion that he had a sexual relationship with his transitional housing case manager, and their treatment of his assertion as evidence of delusional dangerousness, was an actionable form of

---

[4] While "there are subtle differences between . . . the standards adopted by Title II of the ADA for State and local government services . . . [and] those required under section 504 of federally assisted programs and activities, . . . unless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (internal quotation marks and citations omitted). We are aware of no reason why any such subtle distinctions would affect the claims at issue on this appeal.

[5] Although the opinion of the court of appeals in *Bolmer* used the term "mental illness" and did not refer to "bi-polar disorder," the diagnosed mental illness was bi-polar disorder. *See* Mem. Opp'n Summ. J. 2, *Bolmer v. Oliveira*, 570 F. Supp. 2d 301 (D. Conn. 2008) (No. 06-cv-235).

discrimination against his disability in violation of the ADA. We ruled that the plaintiff had produced sufficient evidence to support his ADA claim. McGugan contends her case is indistinguishable.

We disagree. *Bolmer* is susceptible of at least two interpretations. McGugan asks us to read *Bolmer* as support for the proposition that doctors discriminate under the ADA whenever they forcibly hospitalize a patient on the basis of stereotypes about that patient's mental illness, even if the stereotypes pertain to matters appropriately considered in deciding whether to involuntarily hospitalize a patient. Under this reading, our holding in *Bolmer* would be incompatible with the prior holding of *University Hospital*. But it is also possible to read *Bolmer* as meaning that the defendants discriminated against the plaintiff because they assumed, on the basis of stereotypes, that no case worker would have had a sexual relationship with a person suffering from bi-polar disorder, so that the plaintiff's claim of such a relationship must have been the result of erotomaniac delusions. Under this latter reading, the plaintiff stated a claim for discrimination because his bi-polar disorder was irrelevant to whether he had a sexual relationship with his case worker or whether he had erotomaniac delusions.

21

Although the first reading of *Bolmer* would be plausible if one read *Bolmer* on a stand-alone basis, such a reading would directly contradict *University Hospital*'s prior binding precedent, which stated that "section 504 prohibits discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services in question." *Univ. Hosp.*, 729 F.2d at 156. The first reading of *Bolmer*, which we reject, would also give plaintiffs an almost unfettered ability to re-frame claims of medical malpractice into federal claims of discrimination on the basis of disability.

We therefore think the better reading of *Bolmer* is the second. We understand *Bolmer* to hold that, as in *Green* and *University Hospital*, a plaintiff pleads an actionable claim of discrimination in the medical treatment context under the ADA or the Rehabilitation Act if she alleges that the defendants made treatment decisions based on factors that are "unrelated to, and thus improper to consideration of" the inquiry in question. This reading accords *Bolmer* with *University Hospital* and prevents an interpretation of the Rehabilitation Act that would federalize many (if not most) claims for medical malpractice.

In light of our reading of *Bolmer*, *Green*, and *University Hospital*, the district court's dismissal of McGugan's Rehabilitation Act claim must be affirmed. McGugan has not plausibly alleged that Defendants forcibly medicated and hospitalized her on the basis of considerations that were "unrelated to" or "improper to consideration of" the likelihood that she posed a danger to herself or others. Because she failed to make such allegations, she has not stated a claim of discrimination under the Rehabilitation Act. McGugan cannot alter this conclusion by characterizing JHMC's conduct as based on discriminatory stereotyping of people with mental illness. If JHMC's decision was based on stereotyping, it was based on stereotyping of conditions that were appropriate to consider in making the ultimate determination to hospitalize. Accordingly, while McGugan may have alleged negligent medical treatment, she has not alleged actionable discrimination under § 504 of the Rehabilitation Act.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is AFFIRMED.