**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1994**

———————

JANE DOE,

        Plaintiff - Appellant,

v.

UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION; BALTIMORE WASHINGTON MEDICAL CENTER, INC.; KATHLEEN MCCOLLUM; THOMAS J. CUMMINGS, JR., M.D.,

        Defendants - Appellees.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Julie R. Rubin, District Judge. (1:23-cv-03318-JRR)

———————

Argued:  October 22, 2025                    Decided:  December 11, 2025

———————

Before WILKINSON, WYNN and RUSHING, Circuit Judges.

———————

Affirmed by unpublished opinion.  Judge Wynn wrote the opinion, in which Judge Wilkinson and Judge Rushing joined.

———————

**ARGUED:**  Ray M. Shepard, THE SHEPARD LAW FIRM, LLC, Pasadena, Maryland, for Appellant.  Mark S. Saudek, GALLAGHER LLP, Baltimore, Maryland, for Appellees. **ON BRIEF:**  Ella R. Aiken, GALLAGHER LLP, Baltimore, Maryland, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Under the Maryland statute governing health care advance directives, an individual who is appointed as a health care agent in an advance directive cannot also sign that document as a witness. Md. Code, Health-Gen. § 5-602(c)(2)(ii).

In this case, Jane Doe executed a document that appointed her father as a primary health care agent and her mother as an alternate health care agent. Doe's mother also signed the document as a witness. After Defendants refused to honor the document and involuntarily committed Doe during an episode of psychosis, Doe sued the hospital, alleging disability discrimination under the Affordable Care Act, the Americans with Disabilities Act, and the Rehabilitation Act.

Because Doe's mother could not serve as a witness, Doe did not create an advance directive, and we affirm the district court's dismissal of Doe's disability-discrimination claims.

I.

On this appeal from an order granting a motion to dismiss, "we recount the facts as alleged in the complaint, accepting all well-pleaded factual allegations as true." *Washington v. Hous. Auth. of Columbia*, 58 F.4th 170, 175 (4th Cir. 2023).

Doe suffers from episodes of psychosis. At some point between 2016 and 2022, her private physician diagnosed her with a form of non-celiac gluten sensitivity in which ingesting gluten can trigger psychotic episodes.

In July 2022, Doe signed an advance directive form that was downloaded from the Maryland Attorney General's Office website. The document designates Doe's father as her

2

primary health care agent and Doe's mother as her alternate health care agent. Doe circled the option that permitted her agent to approve her admission to a psychiatric hospital. She selected the option to grant her agent authority upon the execution of the directive, rather than when two physicians determined that she was no longer competent. Two witnesses signed the document, one of whom was Doe's mother.

In November 2022, Doe experienced an episode of psychosis and was voluntarily admitted for one month to the Baltimore Washington Medical Center.[1] Dr. Thomas Cummings treated Doe during her admission.

In March 2023, police escorted Doe to the same hospital's emergency room during a similar episode. Dr. Cummings evaluated Doe and noted that her private physician had weaned her off her anti-psychotic medication over the last few months. Dr. Cummings rejected a gluten-related diagnosis and instead diagnosed Doe with schizophrenia. When Doe's father presented Dr. Cummings with the advance directive document, Dr. Cummings told him that the document was invalid under Maryland law, though he did not explain why.

The hospital did not allow Doe's father to voluntarily admit Doe and instead involuntarily committed her. After a hearing, an administrative law judge ("ALJ") certified Doe's involuntary commitment.

---

[1] Baltimore Washington Medical Center is a wholly owned subsidiary of the University of Maryland Medical System, a corporation created by Maryland statute and treated as a state actor. *See Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 584 (D. Md. 2021).

3

Doe's family retained outside physicians to evaluate Doe in April and May, while she remained involuntarily committed. Dr. Richard Ratner observed Doe and concluded that she no longer appeared actively psychotic and thus that there was no longer a basis to involuntarily confine her. Dr. Erik Messamore concluded that Doe showed no evidence of psychosis and did not require inpatient treatment.

At least five state-court actions followed Doe's commitment, seeking Doe's release and judicial review of administrative decisions, among other things. A federal action also alleged substantive and procedural due process violations. On June 12, the parties executed a consent order in one of the state-court cases, a petition for habeas relief, after which Doe was released. The Consent Order conditioned Doe's release on the dismissal of all pending claims and on her agreement to certain post-release treatment requirements, including continuing her medication and switching psychiatrists. Doe challenged the consent order in federal district court. This Court affirmed the dismissal of that challenge under the *Rooker-Feldman* doctrine. *T.M. v. Univ. of Md. Med. Sys. Corp.*, 139 F.4th 344, 356 (4th Cir. 2025).

After Doe's release, a Maryland trial court considered the administrative appeal of the ALJ's decision to certify her involuntary commitment. The court determined that the ALJ had erred in issuing the certification. It concluded that Defendants could not disregard Doe's directive without formally challenging its validity. It further determined that the ALJ's decision to disregard the directive was not supported by evidence because the ALJ heard minimal argument on the directive and did not make factual findings on its validity.

4

Defendants moved for reconsideration and asked the court to find that the Directive was invalid for failing to comply with the witness requirement under the Maryland statute. Md. Code, Health-Gen. § 5-602(c)(2)(ii). The court denied the motion, concluding that the issue was not before the court because it was not adequately addressed in the record. Defendants appealed, but the Maryland appellate court dismissed for mootness because Doe had been released.

Doe then brought this action in the District of Maryland. As relevant to this appeal, Doe alleged disability-discrimination claims under Section 1557 of the Affordable Care Act, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act, each of which arose from the same set of factual allegations. The district court dismissed all of Doe's claims.

## II.

We review the order granting Defendants' motion to dismiss under Rule 12(b)(6) de novo. *Washington*, 58 F.4th at 177. We consider documents that are integral to the complaint and take judicial notice of proceedings in other courts. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

## III.

The Affordable Care Act ("ACA"), the Rehabilitation Act, and the Americans with Disabilities Act ("ADA") each protect individuals from being "excluded from" participation in, "denied the benefits of," or "subjected to discrimination" under the programs covered by each statute. *See* 42 U.S.C. § 18116(a) (ACA); 42 U.S.C. § 12132

5

(ADA); 29 U.S.C. § 794(a) (Rehabilitation Act). The ACA and the Rehabilitation Act cover programs that receive federal funding. *Basta v. Novant Health Inc.*, 56 F.4th 307, 315 (4th Cir. 2022); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 217 (2022). The ADA covers programs provided by a public entity. *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020). The parties do not dispute that the program at issue is covered under all three statutes.

Section 1557 of the ACA "does not have its own anti-discrimination language; instead, it incorporates the grounds of discrimination covered in . . . the Rehabilitation Act." *Lucas v. VHC Health*, 128 F.4th 213, 222–23 (4th Cir. 2025). Thus, Doe must allege facts adequate to state a claim under either the ADA or the Rehabilitation Act. *See, e.g.*, *Basta*, 56 F.4th at 314 (analyzing an ACA claim under the framework of the Rehabilitation Act).

Moreover, we construe the ADA and the Rehabilitation Act "to impose similar requirements," such that "they require a plaintiff to demonstrate the same elements to establish liability." *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 256 (4th Cir. 2022). The statutes differ, however, with respect to the causation element. "To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded 'solely by reason of' his disability; [Title II of] the ADA requires only that the disability was 'a motivating cause' of the exclusion." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461–62 (4th Cir. 2012).

Given the overlapping pleading standards, the district court properly considered Doe's federal claims together. Thus, Doe was required to allege that (1) she is a disabled

6

individual, (2) she was "otherwise qualified" to participate in the program, and (3) she was excluded from or denied the benefits of the program on the basis of her disability. *Id.* at 461. Defendants do not dispute that Doe has satisfied the first element.

Doe contends that she has plausibly alleged two bases for her disability discrimination claims. First, she alleges that Defendants' refusal to follow her advance directive denied her the benefits of a covered program. Second, she alleges that Defendants continued her confinement after it was no longer justified. We address each in turn.

## A.

Doe alleges that Defendants' refusal to follow her advance directive denied her the benefits of the Maryland Advance Directive Program and thus violated her rights under the federal statutes. The district court found that Doe failed to meet the second element to establish her disability claim because she was not "otherwise qualified" for the Advance Directive Program, as her advance directive did not comply with Maryland's statutory requirements.

Maryland's Health Care Decisions Act permits a competent individual to create an advance directive regarding mental health services provided during a period of incompetency. Md. Code, Health-Gen. § 5-602.1(b). The advance directive allows the individual to appoint "an agent to make health care decisions for the individual." *Id.* § 5-602(b)(2); *see id.* § 5-602.1(d)(1) (health care decisions may include "mental health services decisions"). As relevant here, a written advance directive must be "subscribed by two witnesses." *Id.* § 5-602(c)(1). But "[t]he health care agent of the declarant may not serve as a witness." *Id.* § 5-602(c)(2)(ii).

7

1.

As a preliminary matter, Doe argues that a prior Maryland court determination precludes this Court from determining the validity of her advance directive. As discussed above, a Maryland court concluded that the ALJ who certified Doe's involuntary commitment erred by disregarding Doe's advance directive without a formal challenge from the Defendants or any factual findings concerning validity. According to Doe, that means that the directive remains "binding" on the Defendants here. Opening Br. at 37.

We give preclusive effect to state-court judgments according to that state's preclusion law. *Washington v. Pellegrini*, 125 F.4th 118, 127 (4th Cir. 2025). The Maryland test for issue preclusion is familiar: "(i) the issue decided in the prior adjudication is identical with the one presented in the action in question; (ii) there was a final judgment on the merits; (iii) the party against whom the plea is asserted is a party or in privity with a party to the prior adjudication; and (iv) the party against whom the plea is asserted was given a fair opportunity to be heard on the issue." *Id.* (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. Fund for Animals, Inc.*, 153 A.3d 123, 142 (Md. 2017)).

Doe's argument fails at the first step of the issue-preclusion analysis. The Maryland court explicitly declined to determine whether Doe's advance directive was invalid for failure to comply with the witness requirement, explaining that the issue was not before it. Because the Maryland court did not resolve that issue, there is no identical issue to which we can give preclusive effect. We therefore consider the issue in the first instance.

8

2.

We proceed to statutory interpretation. Doe argues that section 5-602(c)(2)(ii)'s declaration that "[t]he health care agent of the declarant may not serve as a witness" bars only a *primary* health care agent from serving as a witness. We disagree. Applying Maryland law, we hold that the agent-as-witness prohibition applies to any health care agent—primary or alternate—who is designated in an advance directive.

"When faced with a question of state law, we must look to decisions of the state's highest court and, if those decisions do not resolve the matter, predict how that court would rule on the state law issue in question." *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 224 (4th Cir. 2025) (cleaned up). Because we find no state court opinion that answers the statutory question at issue, "we use the Supreme Court of [Maryland's] methodology to interpret it in the first instance." *See United States v. Edwards*, 128 F.4th 562, 565 (4th Cir. 2025) (citing *Whitmire v. S. Farm Bureau Life Ins. Co.*, 52 F.4th 153, 157 (4th Cir. 2022)).

Under Maryland law, the "cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature." *Watts v. State*, 179 A.3d 929, 935 (Md. 2018) (citation omitted). "In conducting this inquiry, 'we begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology.'" *Canton Harbor Healthcare Ctr., Inc. v. Robinson*, 340 A.3d 732, 745 (Md. 2025) (citation omitted). We read a provision "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 746.

9

If the statute is ambiguous, we look to "other relevant sources intrinsic and extrinsic to the legislative process." *Id.* (quoting *Lockshin v. Semsker*, 987 A.2d 18, 29 (Md. 2010)). Finally, we "check our interpretation against the consequences of alternative readings of the text." *Id.* "Throughout this process, we avoid constructions that are illogical or nonsensical, or that render a statute meaningless." *Bell v. Chance*, 188 A.3d 930, 944 (Md. 2018).

Here, the issue is whether an alternate agent is an "agent" within the meaning of section 5-602(c)(2)(ii) such that they may not serve as a witness to the directive. Doe designated her mother as her alternate health care agent, and then her mother witnessed the document. If an alternate agent is an "agent" within the meaning of section 5-602(c)(2)(ii), Doe's advance directive fails the statutory requirements for execution.

As discussed above, Maryland's Health Care Decisions Act allows an individual to appoint "an agent" to make health care decisions. Md. Code, Health-Gen. § 5-602(b)(2); *see id.* § 5-602.1(d)(1). It defines "[a]gent" as "an adult appointed by the declarant under an advance directive . . . to make health care decisions for the declarant." *Id.* § 5-601(c). Then it issues the prohibition: "The health care agent" cannot also witness the advance directive. *Id.* § 5-602(c)(2)(ii).

To start, we note that section 5-602(c)(2)(ii)'s prohibition is phrased in the singular: "*The* health care agent" cannot be a witness. But Maryland's rules of interpretation dictate that "[t]he singular includes the plural and the plural includes the singular." Md. Code, Gen. Provisions § 1-202. Thus, "a singular word in a statute is not necessarily limited to only one subject." *Motor Vehicle Admin. v. Gonce*, 130 A.3d 436, 447 (Md. 2016). Indeed,

10

sections 602 and 602.1 speak only of appointing "an agent," and yet the parties do not dispute that a declarant may appoint more than one agent. *See* Md. Code, Health-Gen. §§ 5-602(b)(2) (authorizing "appointing an agent"), 5-602.1(d)(1) (authorizing "designation of an agent"). Interpreting the statute harmoniously, we read the singular uses of "agent" throughout to refer to any agent or agents appointed within the advance directive.

Additionally, Doe argues from general principles of agency law that an agent must be someone with authority. An alternate agent's authority is contingent on certain conditions precedent—here, the unavailability of the primary agent. Thus, Doe argues that an alternate agent is not *yet* an agent when serving as a witness, and therefore that the Maryland statute does not bar an alternate agent from serving as a witness.

But the statute does not define "agent" by authority. Instead, it defines an agent as one "appointed" to make health care decisions. *Id.* § 5-601(c). To "appoint" means to "choose or designate (someone) for a position or job." *Appoint*, *Black's Law Dictionary* (12th ed. 2024); *see also Appointed*, *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/appointed [https://perma.cc/9VTR-MLDU] ("chosen for a particular job"). Declarants choose or designate their agents—whether primary or alternate—when they create the document.

Further, Doe's reading would render much of the witness-as-agent prohibition meaningless. *See Bell*, 188 A.3d at 944. The statute allows a declarant to grant authority to their primary health care agent at the time of execution. *See* Md. Code, Health-Gen. § 5-602(e)(1). That is the option Doe chose. But "unless otherwise provided in the document," the advance directive is not effective until two physicians certify that the declarant is

11

incapable of making informed decisions. *Id.* Thus, the statutory default is that neither primary nor alternate agents have authority at execution. Under Doe's reading, that would mean that even a primary agent could serve as a witness. We reject that illogical result. *See Bell*, 188 A.3d at 944.

Still, Doe urges that even if the statute defines agency by appointment rather than by authority, an alternate agent is not *appointed* until after execution. She points to language in the statutory form.

In section 5-603, the legislature provides an optional form advance directive. Md. Code, Heath-Gen. § 5-603. There, a declarant may select a "back-up" agent with the following language: "If my primary agent cannot be contacted in time or for any reason is unavailable or unable or unwilling to act as my agent, *then I select* the following person to act in this capacity[.]" *Id.* (emphasis added). Thus, Doe argues that an alternate agent is not "selected" until the primary agent is unavailable. Opening Br. at 8.

Even viewing that language in isolation, Doe's reading is dubious. The phrase "I select" is in the present tense, and the declarant must decide who to select before execution. But more importantly, the form also gives an explicit warning: "Anyone selected as a health care agent in Part I may not be a witness." Md. Code, Heath-Gen. § 5-603. Part I includes the selection of primary and alternate agents. *Id.* Thus, to the extent that the statutory form is persuasive, it indicates that the legislature intended to prohibit primary and alternate agents from serving as witnesses.

Finally, we note that our interpretation fits within the "object and scope" of the statute, as reflected in its other provisions. *See Canton Harbor*, 340 A.3d at 746 (quoting

12

*Lockshin*, 987 A.2d at 29). Section 5-602's restrictions on witness qualifications reflect a concern about conflicts of interest that is apparent across several subsections. For instance, health care workers that are caring for the declarant may be witnesses only if they are "acting in good faith." Md. Code, Heath-Gen. § 5-602(c)(2)(i). And at least one witness must be someone without a knowing financial interest in the declarant's death. *Id.* § 5-602(c)(2)(iii). These restrictions reflect a legislative concern with ensuring that a witness to a directive does not operate under a conflict of interest, and the fact that the conflict may be of a future or contingent nature does not resolve that concern.

In sum, Maryland law does not allow an alternate health care agent to serve as a witness to the advance directive that appoints them. Because Doe's mother was designated as an alternate agent, she could not also sign as witness. Thus, the advance directive failed to comply with the statutory requirements for its creation.

### 3.

In a final effort to save the advance directive, Doe argues that we can simply enforce her father's agency appointment and declare her mother's appointment unenforceable. This argument misapplies the severability doctrine.

"Formation challenges render the whole contract unenforceable. There is nothing to enforce if a contract never existed." *Johnson v. Cont'l Fin. Co., LLC*, 131 F.4th 169, 176 (4th Cir. 2025). And "if a contract was never formed, there is no agreement from which any provision . . . can be severed." *Id.* at 177. So severability cannot save a contract if the contract's defect goes to the document's execution. *See id.* (explaining that "formation issues such as 'whether the alleged obligor ever signed the contract'" are distinct from

13

challenges to the validity of individual provisions); *see also Trimble v. Entrata, Inc.*, 791 F. Supp. 3d 615, 631 (D. Md. 2025) (applying Maryland law) (refusing to sever a modification provision that rendered consideration illusory, concluding that the agreement was "never formed").

Maryland law imposes statutory requirements on the formation of a written advance directive. *See* Md. Code, Health-Gen. §§ 5-602, 5-602.1(c)(1) ("An individual making an advance directive for mental health services *shall follow the procedures for making an advance directive* provided under § 5-602 of this subtitle.") (emphasis added). One of those requirements is that the document must be signed and witnessed according to section 5-602(c). Doe's failure to comply with that requirement is a failure at formation that we cannot remedy through severance.

*    *    *

In sum, Doe was not "otherwise qualified" to participate in Maryland's Advance Directive Program because she did not comply with its statutory requirements. Thus, she has failed to state a claim for disability discrimination based on Defendants' refusal to follow her advance directive.

B.

Putting aside the advance directive, Doe contends that she has plausibly alleged a claim for disability discrimination because Defendants prolonged her involuntary

14

commitment without justification in violation of the ACA, the Rehabilitation Act, and the ADA. She advances two theories.[2]

Under her first theory, Doe argues that Defendants discriminated against her on the basis of disability by continuing her confinement based on a biased belief that she would stop taking her medication and so that they could use her confinement as leverage to resolve the then-pending lawsuits.

In considering this claim, we find persuasive the thoughtful analyses of the First Circuit in *Lesley v. Hee Man Chie*, 250 F.3d 47 (1st Cir. 2001) and the Second Circuit in *McGugan v. Aldana-Bernier*, 752 F.3d 224 (2d Cir. 2014).

To treat a disability, health care providers necessarily must make medical decisions based on that disability, which constitutes a "benign form of discrimination" that does not give rise to a discrimination claim. *McGugan*, 752 F.3d at 231. But when providers make medical decisions that are "dictated by bias rather than medical knowledge," those decisions fall within "the pejorative form of discrimination" and are thus barred. *Id.*

When an individual's disability is unrelated to the decision in question, it is an "improper consideration[]" for their doctor to rely on in making that decision. *Id.* at 232. For example, a patient's physical paralysis is unrelated to his ability to consent to hospitalization, so a physician may not properly disregard the patient's objection to hospitalization because of his paralysis. *Id.* Similarly, a decision based on "stereotypes of

---

[2] In her reply brief, Doe argues for the first time that her discrimination claims include a retaliation claim. Doe forfeited that argument by not raising it in her opening brief, *Short v. Hartman*, 87 F.4th 593, 615 (4th Cir. 2023), so we do not address it here.

the disabled rather than an individualized inquiry into the patient's condition" is discriminatory. *Lesley*, 250 F.3d at 55. For example, a physician's refusal to treat a deaf patient because "all deaf people are high risk" could be discriminatory. *Id.* (citing *Sumes v. Andres*, 938 F. Supp. 9, 11–12 (D.D.C. 1996)).

A plaintiff may allege this type of discriminatory motive through allegations that the defendant's stated reasons for a medical decision were pretextual. *Id.* For example, a physician's explanation that he transferred a patient because of the patient's rare blood disorder could be pretextual when the transfer order mentioned only the patient's HIV-positive status. *Id.* (citing *Howe v. Hull*, 874 F. Supp. 779, 788–89 (N.D. Ohio 1994)).

Here, Doe has failed to allege that Defendants' decision to continue her involuntary confinement was based on stereotypes about her disability or based on an unrelated disability.

By Doe's own admission, Defendants continued her confinement out of fear that she would not take her medications after she had previously discontinued her medications upon release from the hospital. But those medications were related to the disability for which Dr. Cummings was treating her, and Doe does not allege that the decision was based on any stereotype.

And, even accepting as true Doe's alternate allegation that Defendants continued her confinement because they feared liability from her pending lawsuits, that motive is not connected either to an unrelated disability or to stereotypes about the disabled.

Under her second theory, Doe argues that she has alleged an unjustified-isolation claim under *Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999). There, the Supreme Court

16

held that "unjustified institutional isolation of persons with disabilities is a form of discrimination[.]" *Id.* at 600. Thus, "under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated[.]" *Id.* at 607. In determining whether an individual is qualified for a transfer, "the State generally may rely on the reasonable assessments of its own professionals[.]" *Id.* at 602.

The district court concluded that Doe had not stated a claim under *Olmstead* because she did not allege that her treating professionals had "determined her involuntary commitment was no longer legally or medically justified/necessary, or that Doe was eligible for care in a less restrictive setting (at least until the Consent Order was signed)." J.A. 70–71.[3]

Doe argues that we may infer that Defendants had determined that Doe's involuntary commitment was unjustified but nevertheless continued to confine her. She identifies two supporting allegations. First, she argues that the "mere existence" of the Consent Order means that the Defendants "did not truly believe" that Doe required inpatient care. Opening Br. at 43. Second, she argues that we may infer from the evaluations of non-treating physicians, Drs. Ratner and Messamore, that Defendants would have made the same observations.

---

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Neither argument is persuasive. The Consent Order, which conditioned Doe's release in part on her agreement to certain post-release treatment requirements, does not support an inference that Defendants had determined that her confinement was no longer justified at any time earlier than the day the Consent Order was executed. Nor do the differing opinions of the non-treating physicians lead to a reasonable inference that her treating physician, Dr. Cummings, would have made the same observations and similarly concluded that Doe's commitment was no longer justified several months before her release.

IV.

Jane Doe has not stated a claim for disability discrimination under the ACA, the Rehabilitation Act, or the ADA. By failing to comply with the statutory requirements to create an advance directive, Doe was not qualified for the program from which she alleges exclusion. Her alternative allegations based on the timing of Defendants' decision to end her involuntary commitment similarly fail to allege discrimination on the basis of a disability or Defendants' belief in her qualification for release.

For the foregoing reasons, the district court's judgment is affirmed.

*AFFIRMED*